IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NUMBER |
| | : | 1:13-CR-345-ODE-JSA |
| ARTURO SANCHEZ-RUIZ | : | |

## **REPORT AND RECOMMENDATION**

On July 29, 2013, acting on a tip that Defendant was an alien in possession of a firearm, U.S. immigration agents caused local police to pull over a car in which Defendant and another individual were riding. This traffic stop caused a chain of events that resulted in the Defendant making incriminating statements and consenting to a search of his residence, where a gun and drug paraphernalia were found. This Indictment – which charges Defendant with illegal firearms possession as an alien and with illegal re-entry after deportation – followed.

Defendant now moves to suppress his statements and the proceeds of the consent search and all other evidence resulting from the July 29 traffic stop. Motion [12]. Defendant contends that he was arrested without probable cause, that his consent to search was involuntary, that he was not provided his required warnings prior to be interrogated, and that any statements he made were involuntary. *Id.* For the reasons stated below, the Court **RECOMMENDS** that Defendant's Motion [12] be **DENIED**.

## PROCEDURAL HISTORY

The Court held an evidentiary hearing on December 12, 2013 [21]. At the conclusion of the hearing, the Court set a briefing schedule that allowed for Defendant to file a post-hearing brief by January 6, 2014 [21]. No such brief was filed, and so the Court on January 8, 2014 issued an Order directing Defendant, if he wished to file a brief, to show cause why he should be granted an extension [22]. Defendant filed a motion on January 10, 2014, requesting an extension. [23]. The Court granted the motion, and set a new deadline for January 14, 2014, as Defendant requested. [24]. No post-hearing brief was filed by the new deadline either. The Court nevertheless ordered that the Government file a post-hearing brief. [25]. After timely requesting and receiving two short continuances, the Government's post-hearing brief was timely filed on February 3, 2014. [31].

## FACTS

This case began with a tip that Special Agent Steven Ledgerwood, U.S. Homeland Security Investigations ("HSI") received from a confidential informant ("CI"), stating that an individual who resided at an apartment located on Jameson Pass in Alpharetta, Georgia, was a previously deported felon who was involved in drug trafficking. *See* Transcript of December 12, 2013 Hearing [30] ("Tr.") at 12. The CI stated that the suspect drove a white Escalade. *Id.* Thus, on July 29, 2013, Ledgerwood and other agents conducted surveillance of the Jameson Pass

apartment, observed the white Escalade, and followed that vehicle as it drove away at some point during the day. *Id.* at 7-8, 12. While the Escalade was still driving, Ledgerwood contacted Officer Michael Schulman, with the Alpharetta Police Department, and asked him to follow the Escalade and stop it if he observed probable cause of a traffic violation. *Id.* at 72-73. Schulman then began following the Escalade and observed that it changed lanes without signaling during a time of heavy traffic. *Id.* at 72-73. Schulman determined on this basis that he possessed probable cause to stop the vehicle. *Id.* at 72. He then activated his lights and ordered the Escalade to pull over. *Id.* at 74.

Schulman approached the car on the driver's side, informed the driver, Ramon Hull, that he had not signaled when he changed lanes, and asked for identification. *Id.* at 75, 81, 88-89. Hull stated that the stop was "a good probable cause" stop and produced his driver's license. *Id.* at 75. Schulman asked Hull who the car belonged to, and Defendant, who was the passenger, responded that it was his wife's car. *Id.* at 74. At that point, Schulman asked Defendant his name, and Defendant responded by handing Schulman a Mexican ID card with the name "Rene Salas-Moreno." *Id.* at 75.

Schulman returned to his vehicle and called Ledgerwood. *Id.* at 76. He also ran the information Defendant had provided him through law enforcement

databases, and the name "Rene Salas-Moreno" came up as an alias. *Id.* at 79, 95. Ledgerwood advised Schulman to try to verify Defendant's actual information so that they did not detain the wrong person. *Id.* at 79. Schulman then requested over his police radio that an officer with a fingerprint scanner come to the scene to fingerprint Defendant. *Id.* at. 79-80.

Shortly thereafter Ledgerwood, who was in plain clothes and driving an unmarked car, arrived on the scene and introduced himself to Defendant. *Id*. at 10-11, 38. He explained that he was conducting an investigation and asked if Defendant would speak with him. *Id.* at 11. Defendant agreed, and so Ledgerwood asked if they could talk somewhere other than on the side of a main road. *Id.*. Defendant indicated that he lived in an apartment nearby. *Id.* Ledgerwood asked if Defendant would be willing to go with the agents to his apartment to talk, and Defendant agreed. *Id.*

Ledgerwood rode to the apartment in Task Force Officer Max Meyer's vehicle, unrestrained and in the front seat. *Id.* at 13-14. Defendant directed Officer Meyer to the apartment on Jameson Pass, which was a few minutes away. *Id.* at 113. Ledgerwood, Defendant, and Meyer arrived at the apartment at the same time. *Id.* at 15, 114. ICE Agents Christian Owen, David Schweitzer, and Sean Riley were already there. *Id.* at 15-16, 130.  Agent Ledgerwood described the following

conversation he had with the Defendant as they approached the door of the apartment:

> Before we went up to the apartment I said, is anybody else inside? I wanted to make sure there wasn't somebody else in the apartment. He said, no, no, nobody's here. I said, is there anything that's dangerous or, you know, could cause us harm or anything? And he said, no, no, there's nothing. And then he started to open the door. Right before he put the key in he said, oh, there is a gun inside. I said okay. And he said, I got the gun for protection because of a burglary or robbery? And I said, okay. That's fine. I said, just if you could tell us where the gun is, and he said okay.

*Id.* at 15-16.

Defendant stated that the gun was located in the bedroom, under a pillow. *Id.* at 15-16. Upon entering the apartment, Ledgerwood directed Owen and Schweitzer to retrieve the gun and they immediately found it exactly where Defendant had said it was. *Id.* at 16. Schulman, who arrived after the agents had entered the apartment, ran the serial number on the gun and determined that it was stolen. *Id.* at 85-86.

After Owen and Schweitzer retrieved the gun, Ledgerwood asked Defendant for consent to search the apartment. *Id.* at 16. Defendant gave verbal consent, but Ledgerwood also presented a consent form written in Spanish, Defendant's native language. *Id.* at 17. He then went over the form with Defendant, and explained that the form gave the agents consent to search the apartment for drugs or weapons. *Id.*

at 18-19. Defendant signed the form and Ledgerwood and Owen signed it as witnesses. *Id.* at 18, 133.

After Defendant signed the consent form, the agents conducted a search and found various apparent drug paraphernalia and cash. *Id.* at 18-19. While the search was occurring, the Alpharetta police officer with the fingerprint scanner arrived. *Id.* at 19. Defendant was fingerprinted and the results revealed that his true identity was Arturo Sanchez-Ruiz, a previously deported felon. *Id.* at 20. At that point, Defendant was arrested. *Id.* at 21-22.

## DISCUSSION

### I. THE TRAFFIC STOP WAS LAWFUL

Defendant's motion states that the search of his house was the product of, among other things, his "arrest, which was not supported by probable cause." Def. Mot. at 12. The evidence, however, showed that Defendant was only arrested after the consent search of his residence was underway, and there was no evidence that appears to have resulted specifically from the arrest itself. Tr. at 18-22. To the extent Defendant intended to argue that the original traffic stop should be considered the functional equivalent of an arrest and/or lacked a lawful basis, he has waived that argument by not "plainly and prominently" asserting it, either in

his original motion or in a brief addressing the facts adduced at the evidentiary hearing.  *See United States v. Blackley*, 439 F.App'x 803, 804 (11th Cir. 2011).[1]

Nevertheless, in the interests of caution, because the Motion alleges an invalid seizure, the Court will discuss whether the evidence establishes a lawful traffic stop.  In order to at least briefly stop a vehicle, an officer must have reasonable and articulable suspicion that the occupants are engaged in criminal activity.  *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Sharpe*, 470 U. S. 675 (1985).  To make a showing that in fact the officers had reasonable suspicion, they "must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity.'"  *Illinois v. Wardlow*, 528 U.S. 119, 123-4 (2000) (quoting *Terry*, 392 U.S. at 27).  However, the "officer's motive in making the traffic stop does not invalidate what is otherwise 'objectively justifiable behavior under the Fourth Amendment[.]'"  *United States v. Simmons*, 172 F.3d 775, 778

---

[1] The Government argues that Defendant's motion in its entirety is waived or abandoned by his failure to file a post-hearing brief.  The Government cites Fed.R.Crim.P. 12(b)(3)(C), which provides that motions to suppress must be raised before trial and before any pretrial deadlines set by the court.  Here, the Defendant filed a timely motion to suppress, so the issue is not a failure to file an appropriate motion before the deadline.  The issue, rather, is the failure to perfect the motion with a post-hearing brief that grapples with the actual facts of the case.  It may very well be that the Court could deem the motion abandoned, but that is an extreme result, and the Governments cites no authority specifically in this circumstance.  The Court in the interests of caution will therefore assume, *arguendo*, that Defendant's motion is not waived, and will discuss the merits of any arguments that were stated in his Motion [12].

(11th Cir. 1999) (quoting *Whren v. United States*, 517 U.S. 806, 812 (1996)).

Probable cause is not required to justify an investigative stop; reasonable suspicion is sufficient. *United States v. Powell*, 222 F.3d 913, 917-8 (11th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-5 (11th Cir. 1996). However, if the scope of a traffic stop exceeds that of an investigative stop of limited duration, it constitutes an unreasonable seizure unless it is supported by probable cause. *See United States v. House*, 684 F.3d 1173, 1199 (11th 2012).

Here, Agent Ledgerwood requested that Officer Shulman pull the Escalade over, but only if Officer Shulman had his own probable cause to do so. Tr. at 72. Officer Shulman testified that he saw the Escalade make an improper lane change, that is, a lane change while not using a turn signal. *Id.* at 72-73. The relevant statute is Ga. Code Ann., § 40-6-123, which provides that:

> (a) No person shall . . . change lanes or move right or left upon a roadway unless and until such movement can be made with reasonable safety. No person shall so turn any vehicle without giving an appropriate and timely signal in the manner provided in this Code section.
>
> (b) A signal of intention to . . . change lanes when required shall be given continuously for a time sufficient to alert the driver of a vehicle proceeding from the rear in the same direction or a driver of a vehicle approaching from the opposite direction.

Georgia courts have broadly interpreted this statute as requiring drivers to

use their turn signal whenever other traffic is nearby. *See, e.g., Salinas–Valdez v. State,* 624 S.E.2d 278, 280 (Ga. App. 2005) (violation committed based on officers' observation that "a car behind them change[d] lanes without signaling and then pull[ed] in front of their patrol car. Traffic was 'medium heavy to heavy' with approximately 20 vehicles nearby traveling in the same direction. In the officer's opinion, the lane change was unsafe."); *Tukes v. State*, 511 S.E.2d 534, 536 (Ga. App. 1999) (violation committed when vehicle "turned from the slow lane to the middle lane in traffic, [with] vehicles coming up from the rear traveling to his left and then went back into the slow lane without signaling.")

Otherwise, if a turn or lane change can be made with "reasonable safety" absent a signal, no turn signal is required. *See Bowers v. State*, 473 S.E.2d 201, 203 (Ga. App. 1996). For example, in a case where the nearest following car was approximately 100 yards away, and no other evidence was offered as to a particular need to signal, the Georgia Court of Appeals found no objective basis for violation. *Id.*

Officer Shulman's testimony established reasonable suspicion of a violation of this provision. He explained that the Escalade failed to use signals while changing lanes, in the midst of "heavy' traffic on "one of the busiest roadways" in Alpharetta, during the 5:00 pm rush hour. *Id.* at 72-73. This was a legally

sufficient basis to pull over the car.  Having stopped the car, Officer Shulman was then permitted to briefly detain the occupants while he ran computer checks to determine their identity.  *See United States v. Purcell*, 236 F.3d 1274 (11th Cir. 2001).  And because the routine record check as to the Defendant yielded suspicious results–suggesting that Defendant had produced a fake identification– Officer Shulman was further justified in continuing the investigatory stop to investigate the Defendant's identity including by calling for a fingerprint scanner.  *See United States v. Cantu*, 227 Fed.Appx. 783, 785 (11th Cir. 2007) (having reasonable suspicion to stop a car for a traffic violation, officer then "had a duty to investigate suspicious circumstances that [came] to his attention after the initial stop and ... did not act unreasonably in questioning the Cantus about Hector's identity and his authorization to be in the truck.")   All of this investigative activity was reasonably part of the traffic stop and did not elevate the stop into an arrest requiring probable cause.

## II.    DEFENDANT'S CONSENT WAS LAWFUL

Defendant also argues that his consent to search was involuntary and the product of police coercion.  "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).  In considering

whether a consent to search was voluntary, the Court must examine the totality of the circumstances. *United States v. Tovar-Rico*, 61 F.3d 1529, 1535 (11th Cir. 1995); *see also United States v. Gonzalez*, 71 F.3d 819, 828-32 (11th Cir. 1996) (illustrating factors properly to be considered in totality of circumstances inquiry). Further, "'[t]he government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.'" *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (*quoting United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)). The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent." *Gonzalez*, 71 F.3d at 828 (*quoting Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)). *See also Florida v. Bostick*, 501 U.S. 429, 438 (1991) ( "'Consent' that is the product of official intimidation . . . is not consent at all.").

The Eleventh Circuit has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when assessing the voluntariness of a consent to search: voluntariness of the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and the defendant's belief that no

incriminating evidence will be found.  *United States v. Blake*, 888 F.2d 795, 798-9 (11th Cir. 1989).

      The facts here show voluntariness.  When Ledgerwood introduced himself to Defendant at the road side, the Defendant displayed a normal demeanor, and was relaxed.  Tr. at 11.  He was not in handcuffs, under arrest, or otherwise in custody.  While he remained under temporary detention as part of the traffic stop, that is not the same as being "in custody" for purposes of Fourth and Fifth Amendment analyses.  *See, e.g., Berkemer v. McCarty*, 468 U.S. 420, 423, 441-442 (1984).  Ledgerwood's testimony suggests that he requested, and did not demand, information from the Defendant.  He asked whether the Defendant would speak with him as part of an investigation, and he asked the Defendant if it would be acceptable to speak somewhere other than the side of the road.  *Id.* at 11, 37-38.  The Defendant agreed and affirmatively volunteered his residence.  *Id.*  Ledgerwood did not bring up the residence; the Defendant did.  *Id.*

      When they reached the residence, Ledgerwood asked "if it would be okay to search," and the Defendant affirmed "yes, go ahead – he kept saying, go ahead and search.  Go ahead.  There's nothing."  Tr. at 16-17.  In addition to this verbal consent, Ledgerwood presented a consent form in the Defendant's native Spanish,

which Defendant signed.  *Id.* at 17-18; Gov't Ex.1.[2]  By signing the form, a translation of which was entered into evidence, Defendant affirmed that "I have decided to give the ICE Special Agents ... to make a complete search of the place I occupy located at .... Jameson Pass, Alpharetta Georgia," that "I permit the ICE Special Agents of my own free will to conduct a complete search of my property," that "my consent has been given voluntarily and without being subject to threats, promises, pressure or coercion of any kind," that "I ... have been informed by [the agents] of my right to refuse to give my consent to search," and "I have read the above statement and understand my rights."  Gov't Ex. 1.[3]  During this entire time, the Defendant was not under arrest and, as Ledgerwood explained, because the agents had not positively identified the Defendant yet, "there really wasn't an offense that we could knowingly arrest him for right that second."  Tr. at 30.  These factors all combine to establish voluntariness.

---

[2] Ledgerwood explained that the Defendant conversed with him in and clearly understood English as well.  Tr. at 17.

[3] Defendant's Motion [12] alleges that "his purported signature on the 'Consent to Search' was not, in fact, executed by him." [12] at 4.  Ledgerwood, however, testified that he witnessed the Defendant sign the form.  Tr. at 18.  Thus, the Court rejects this ground for suppression.

### III. DEFENDANT'S STATEMENTS WERE MADE VOLUNTARILY AND NOT IN VIOLATION OF *MIRANDA*

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of his right to the assistance of counsel prior to any interrogation by law enforcement. The Government has the burden to show the knowing and intelligent nature of a *Miranda* waiver. *Id.* at 475. The Supreme Court instructs courts to look for two things:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation omitted).

In addition to its compliance with *Miranda*, the Government must also show that the Defendant's statements were made voluntarily. Determining whether a statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Jones*, 32 F.3d 1512, 1516 (1994); *see Arizona v.*

*Fulminate*, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

Here, *Miranda* did not apply to any of the statements Defendant made at the road side, or the admissions he made about the gun upon entering the house, because he was not "in custody." *Miranda* only applies once a suspect is in custody, that is, once he has been arrested or suffered restrictions on his freedom equivalent to that of a formal arrest. *See Berkemer*, 468 U.S. at 442. Up until the point when the fingerprint scanner arrived, the agents confirmed Defendant's identity, and they arrested him, he was not "in custody" for purposes of the *Miranda* analysis. Rather, he was briefly detained as part of a traffic stop, and then voluntarily cooperated with the agents.[4] None of this constituted an arrest.

Nor did Ledgerwood violate *Miranda* by asking Defendant, as they were

---

[4] A mere traffic stop does not constitute custody and does not trigger *Miranda*'s protections at least as to questioning within the scope of the investigatory stop, which includes questioning as to a suspect's identity and possession of weapons. *See Berkemer*, 468 U.S. at 442.

entering the house, "is there anything that's dangerous or, you know, could cause us harm or anything." Tr. at 15.  It is well established that officers may ask those safety-related questions, without violating *Miranda*.  *See United States v. Newsome*, 475 F.3d 1221 (11th Cir. 2007) (officer permissibly asked arrested defendant, before *Miranda* warnings, "is there anything or anyone in the room I should know about," to which defendant disclosed the location of a gun); *United States v. Jackson*, 280 F.3d 403, 405-406 (4th Cir.2002) (finding that an officer was "fully justified" in inquiring about weapons after making a traffic stop); *Cf. Pennsylvania v. Mimms*, 434 U.S. 106, 109-12 (1977) (finding no Fourth Amendment violation where an officer who had made a routine traffic stop asked the driver to exit the vehicle to reduce the danger to himself); *Michigan v. Long*, 463 U.S. 1032, 1051 (1983) (finding that a protective search of passenger compartment of motor vehicle during a lawful investigatory stop of a vehicle was reasonable).  It follows that officers can ask those same questions of individuals who have voluntarily consented to a search of their premises.

      Thus, *Miranda* did not apply to these pre-arrest statements and the agents' failure to provide warnings to the Defendant until after he had made statements about the gun is no ground for suppression.  And the facts show that the Defendant's were otherwise voluntarily-made, for all the reasons discussed above

as to the voluntariness of the Defendant's consent to search.

## **CONCLUSION**

The Court **RECOMMENDS** that Defendant's Motion [12] be **DENIED**.

This matter is **READY FOR TRIAL**.

**IT IS SO ORDERED** this 14th day of February, 2014.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE